**UNITED STATES of America, Appellee,**

v.

**Robert Lawrence CRIM, a/k/a Robert L. Crim, Appellant.**

No. 75–1117.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 11, 1975.

Decided Dec. 8, 1975.

Certiorari Denied March 29, 1976.
See 96 S.Ct. 1497.

E. Edward Johnson, U. S. Atty., District of Kansas, Topeka, Kan., for appellee.

Frank M. Rice, Topeka, Kan., for appellant.

Before BREITENSTEIN, HILL and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Robert Lawrence Crim (Crim) appeals his jury conviction of issuing checks in violation of 18 U.S.C.A. § 2314.[1]

Crim was indicted on two counts:

On or about May 25, 1973, _ _ _ ROBERT LAWRENCE CRIM _ _ _ wilfully, unlawfully and knowingly and with fraudulent intent, _ _ _ caused to be transported in interstate commerce _ _ _ a falsely made, _ _ _ security _ _ _ Check No. 119 dated May 25, 1973, in the amount of $180.00, payable to Robert L. Crim, purportedly signed by Richard B. Cole, _ _ _.

On or about September 20, 1973, _ _ _ ROBERT LAWRENCE CRIM _ _ _ wilfully, unlawfully and knowingly and with fraudulent intent, _ _ _ caused to be transported in interstate commerce _ _ a falsely made, _ _ _ security, _ _ _ Check No. 135 dated September 20, 1973, in the amount of $86.00, payable to Robert L. Crim, purportedly signed by Richard B. Cole, _ _ _.

The Government's case relied on the testimony of four principal witnesses:

Cornelius F. Cole (Cole), a utility clerk for City National Bank and Trust Company (Bank) of Kansas City, Missouri, testified and presented evidence that: Crim, using the alias of "R. Bob Cole", along with several other people, opened an account at Bank on December 11, 1970, under the name of the Committee of Concerned Citizens (Committee); checks written on the account required the signatures of the Committee's two

---

1.  18 U.S.C.A. § 2314 provides in part:

    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transport-

    ed, . . . in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money . . . ..

    \* \* \* \* \* \*

    Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

coordinators, "Allen Wilson" and "R. Bob Cole"; the two checks at issue herein were the only checks written on the Committee's account containing one drawer signature only; and, that the account was closed on October 29, 1971, by the Bank after four "insufficient funds" checks had been returned in March of 1971. Cole further testified that notice of the account's closure was effectuated in the Bank's normal manner, but that he was unable to state categorically that notice of closure was actually received. He identified numerous checks drawn on the account prior to its closure signed by "R. Bob Cole" and "Allen Wilson". He identified the Committee checks involved herein which were made after the account had been closed for more than one year and a half, made payable to "Robert L. Crim" and signed by "Richard B. Cole, President."

James C. Codigan, a handwriting expert and special agent of the Federal Bureau of Investigation, testified that he had examined numerous handwriting exemplars of Crim; that he had compared the writing on the two checks in question; and that, in his expert opinion, Crim had written both checks and had also endorsed "Robert L. Crim" on each of them.

Donald Rasch identified Crim as the person for whom he had cashed the Count I check for $180.00 on May 27, 1973.

Martha Goff identified Crim as the person for whom she had cashed the Count II check for $86.00 on September 20, 1973.

In each instance Crim represented or identified himself to be "Robert L. Crim", the payee designate of the checks, and he endorsed the checks in that name.

Crim did not testify. However, several defense witnesses did testify relative to Crim's usage of the name "R. Bob Cole" and of the establishment of the Committee.

Allen Wilson testified that Crim had been hired as "Bob Cole" to direct a summer youth program in Kansas City, Missouri, in 1970; that Crim pursuant to his employment was issued identification cards under the name of "Cole"; that Crim, using the name "Cole" was involved in the formation of the Committee; that he and Crim were the coordinators for the Committee; and that Bank was directed to send the Committee's "checks, notices and so forth" to Crim's home in Kansas City which served as the Committee headquarters. Wilson stated that "naturally all information concerning it [Committee's account with Bank] went back to" Crim's address.

On cross-examination Wilson testified that he knew Crim by the name of "Crim" when they were both prisoners at a diagnostic center in 1965; that he had no knowledge as to the status of the Committee in 1973; and that he was not prepared to introduce evidence establishing that the authorization to withdraw funds from Committee's account had been changed from two designated persons to one.

Fran Wilson, wife of Allen, testified that she knew Crim as "Cole", that she occasionally went to Committee meetings, and that the Committee's headquarters were at Crim's house.

Shirley Crim, appellant's estranged wife, testified that when she first met appellant he had used the name "Crim"; that she and Crim "had been together" for six years; that he had assumed the name of "Cole" because he had had some problems with a family in Omaha; that while they were living in Kansas City in 1969–1970 he was using the name "Cole"; that during their stay in Kansas City they had a son whom they named "Bobby Crim"; that she was not aware that the Committee account had been closed; and that she had some knowledge of the Committee's account but she did not know if a deposit had been made to it during the 1971–1973 period after they departed Kansas City.

On appeal Crim contends that: (1) the Trial Court erred in failing to grant his motion for a bill of particulars; (2) as a

matter of law there was not a falsely made or forged security; (3) the Trial Court erred in refusing to allow the introduction of evidence relative to the number of signatures required on the Committee's check; (4) the Trial Court erroneously allowed the introduction of evidence concerning his criminal record; (5) he was denied a fair trial because of publicity surrounding the Trial Judge; and (6) he was denied a fair trial because the Trial Court failed to provide adequate funds for an investigator.

I

■ Crim contends that the Trial Court erred in refusing to grant his motion for a bill of particulars. Crim argues that as a result of this denial "he was not sufficiently informed of the nature and cause of the accusation and therefore could not properly prepare his defense." We hold that the indictment was sufficiently definite to adequately apprise Crim of the charges against him. *United States v. Baca,* 494 F.2d 424 (10th Cir. 1974).

■ Crim summarily alleges that the indictment was inadequate. He has not, however, established that there were problems of surprise, vagueness, or indefiniteness. Fed.R.Crim.P., Rule 7(c), 18 U.S.C.A., requires, inter-alia, that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." We hold that the indictment met legal requirements. Absent prejudice the denial of a motion for a bill of particulars is not error. In *United States v. Smaldone,* 484 F.2d 311 (10th Cir. 1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974), we noted:

> There was no problem of surprise and no problem of vagueness or indefiniteness. Defendant was apprised of the charge against him and was not prejudiced in the preparation of his defense. 484 F.2d at 320.

■ Crim has completely failed to show any prejudice to his defense because the indictment did not list the details of each count with greater specificity. Sufficiency is determined by practical rather than technical considerations. *Clay v. United States,* 326 F.2d 196 (10th Cir. 1963), cert. denied, 377 U.S. 1000, 84 S.Ct. 1930, 12 L.Ed.2d 1050 (1964); *United States v. Miller,* 491 F.2d 638 (5th Cir. 1974), cert. denied, 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974). The indictment was more than adequate as drafted and any possible deficiencies inherent therein were not of such a substantial nature so as to vitiate the efficacy of Crim's defense. *Wyatt v. United States,* 388 F.2d 395 (10th Cir. 1968). *See also United States v. Tucker,* 473 F.2d 1290 (6th Cir. 1973), cert. denied, 412 U.S. 942, 93 S.Ct. 2785, 37 L.Ed.2d 402 (1973), and *United States v. Gray,* 464 F.2d 632 (8th Cir. 1972).

II

■ Crim argues that, as a matter of law, there was not a "falsely made" or "forged security" involved in the case at bar. He urges that this necessarily follows because he could validly use another name, since the two checks were drawn on his "own name" there was no forgery; and because the Committee's bank account was not established with a fraudulent intent.

The fallacy inherent within the above postulate, and which in our view renders it void of rationality, is that Crim cannot have two "real" names during any one given period of time.

An appellate court must, following a conviction, view the evidence in the light most favorable to the Government to decide if there is substantial proof, direct or circumstantial, together with all reasonable inferences to be drawn therefrom, from which a jury might find an appellant guilty beyond a reasonable doubt. *United States v. Crocker,* 510 F.2d 1129 (10th Cir. 1975); *United States v. Downen,* 496 F.2d 314 (10th Cir. 1974), cert. denied, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974); *United States v. Yates,* 470 F.2d 968 (10th Cir. 1972).

It is uncontested that: the Committee's account required that each check have two drawer signatures; the two checks involved herein were the *only* checks drawn on the account consisting of one drawer signature; Crim was identified as the person who passed both checks; the Committee's account was closed in October of 1971 and the checks were written in May and September of 1973; the account was closed pursuant to the Bank's normal procedure and notice was tendered by the Bank following the account's closure; and that Wilson, a Committee coordinator with Crim, had no knowledge of the status of the Committee in 1973. Furthermore, Crim signed both checks in question as drawer as "Richard B. Cole, President", and thereafter he endorsed both checks as "Robert L. Crim". No evidence was offered to establish that Crim was president of the Committee, that the Committee had authorized him to sign checks by himself, or that the Bank was notified that Crim alone could sign the Committee's checks.

It is also uncontested that Crim could not have had two "real" names during the 1973 time period when he cashed the subject checks. Assuming that "Cole" was Crim's real name during the 1970–1971 period when the Committee was established and was functioning as a legitimate charity, he was no longer using "Cole" as his "real" name in 1973 when he cashed the two checks because in each instance he identified himself as Crim. We hold that under these circumstances the checks were "falsely made" and "forged".

Applying these uncontested facts to the applicable law, it is clear that this case does not have the unique tenor that Crim argues.

■ As used in criminal statutes, the words "falsely made" and "forged" are homogeneous. They have been used to describe a "spurious or fictitious making", and, as such, relate to the "genuineness of execution". *Marteney v. United States,* 216 F.2d 760 (10th Cir. 1954), cert. denied, 348 U.S. 953, 75 S.Ct.

442, 99 L.Ed. 745 (1955). Crim knew at the execution of the checks that the signature of "Cole" was falsely made and not genuine, since he was no longer using the name "Cole"; such knowledge may be imputed to him. *United States v. Tasher,* 453 F.2d 244 (10th Cir. 1972). Furthermore, by signing an assumed name, Crim's actions tended to establish fraudulent intent. *Kreuter v. United States,* 201 F.2d 33 (10th Cir. 1952). They likewise tended to establish a scheme to defraud. *United States v. Scott,* 457 F.2d 848 (10th Cir. 1972), cert. denied, 409 U.S. 866, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972). Crim's actions further caused the checks to move in interstate commerce in violation of Section 2314, *supra.* *Kreuter v. United States,* 376 F.2d 654 (10th Cir. 1967), cert. denied, 390 U.S. 1015, 88 S.Ct. 1267, 20 L.Ed.2d 165 (1968).

The above cited decisions are supported by those rendered by other Circuits. The Fifth Circuit has consistently held that the use of a fictitious name falsely made gives rise to a "forgery" when employed, as here, with the intent to defraud. *Edge v. United States,* 270 F.2d 837 (5th Cir. 1959), *Hubsch v. United States,* 256 F.2d 820 (5th Cir. 1958). *See also Stinson v. United States,* 316 F.2d 554 (5th Cir. 1963). The Seventh Circuit has held that when a defendant has knowledge that a check has been "forged" or "fraudulently made" a Section 2314 violation arises. *United States v. Solomon,* 422 F.2d 1110 (7th Cir. 1970), cert. denied, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970).

Crim endorsed the two Committee checks in 1973 as "Crim". His use of the name of "Richard B. Cole, President" as drawer gave rise to "falsely made" and "forged" checks.

## III–IV

Crim contends that the Trial Court erred in (1) refusing to permit the introduction of evidence relative to the number of signatures required to draw checks on the Committee's account, and

in (2) allowing the introduction of evidence concerning his criminal record.

The relevancy and materiality of evidence, and its admissibility, are matters within the sound discretion of the Trial Court and will not be disturbed on appeal unless there is a clear abuse of discretion. *Young v. Anderson,* 513 F.2d 969 (10th Cir. 1975); *United States v. Ray,* 488 F.2d 15 (10th Cir. 1973); *United States v. Brumley,* 466 F.2d 911 (10th Cir. 1972), cert. denied, 412 U.S. 929, 93 S.Ct. 2755, 37 L.Ed.2d 156 (1973). Applying this standard we hold that the Trial Court did not err in admitting evidence relative to the number of signatures required and Crim's criminal background.

■ Even though Crim was unable to produce any documentary evidence which would establish (and thereby rebut the Government's evidence) that the authorization to withdraw funds from the Committee's account had been changed from two persons to one person, and even though the Committee's second coordinator, Wilson, testified that he had no knowledge of the status of the Committee during the year 1973 when the two subject checks were written, Crim nonetheless argues that Wilson should have been allowed to testify that one person, acting alone, was authorized to write checks on the Committee's account. This contention was properly rejected by the Trial Court:

THE COURT: You want to have him testify that, "Yes, I met somebody somewhere and we agreed that one man could write the check." The Court is not going to let you show that.

MR. RICE: All right. That—so that the Court understands, yes, that is exactly what I would ask.

THE COURT: That is what you want to show, and the Court is not going to let you. There is not a check in that whole bunch that wasn't signed by both of these fellows, and there is not a bit of record. The bank would not have honored the check written on his say-so.

MR. RICE: I understand, but so—for the record, I think it does bear upon the question of whether it—there was a lawful check or an unlawful check as to whether the persons whose account it is considered it lawful or unlawful. That is the purpose of it.

THE COURT: The issue is not whether it is a lawful check or not. The issue in this check is whether it was falsely made for the purpose of falsely representing that it was a good check and to get away, and to get this money away. No, the Court is not going to let you do that. We are going to stay on the issues that are involved in this case.

■ Crim also contends that the Trial Court erroneously allowed evidence relative to his criminal record. This argument is without merit. Crim's past criminal record was opened up during the *direct* examination of Crim's witness, Wilson:

Q How did you become acquainted with Mr. Richard B. Cole, i. e., Crim?

A I met Bob in 1965 _ _ _. I was working out at the clinic, well the Diagnostic Center _ _ _ and I met Bob then.

Thereafter Wilson was properly subject to cross-examination on the subject matter:

Q You said you knew him in 1965 in Topeka; is that correct?

A That's right.

Q Where was that?

A At the Diagnostic Center.

Q What type of facility is the Diagnostic Center?

\* \* \* \* \* \*

A It's a pre-sentencing Diagnostic Center.

Q Where prisoners are held; is that correct?

A Prisoners and/or _ _ _ right.

\* \* \* \* \* \*

Q   Was Mr. Crim a prisoner at that time?

A   That is true.

Crim made the tactical error of allowing his own witness to testify where they had met in 1965. The cross-examination was within proper limits.

The scope of cross-examination is within the sound discretion of the Trial Court. *United States v. Spivey,* 508 F.2d 146 (10th Cir. 1975), cert. denied, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104; *United States v. Worth,* 505 F.2d 1206 (10th Cir. 1974), cert. denied, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975); *United States v. Smaldone, supra.* Thereafter, it is the exclusive function of the jury to determine the relative credibility of the witnesses. *United States v. MacClain,* 501 F.2d 1006 (10th Cir. 1974); *United States v. Brumley, supra; United States v. Sierra,* 452 F.2d 291 (10th Cir. 1971). The Court properly handled the admissibility of the evidence involved in the issues above presented.

V

Crim contends, in summary fashion, that he was denied a fair trial because of the publicity surrounding the retirement of the Trial Judge. This contention is not only advanced without cogent authority, but it is completely frivolous and without merit.

The "adverse publicity" allegedly arose from a newspaper article describing the Trial Judge's assumption of senior status. Although newsworthy, it was certainly not prejudicial to Crim in any manner. The law will not presume that jurors were exposed to pre-trial publicity or were prejudiced thereby. *United States v. Tokoph,* 514 F.2d 597 (10th Cir. 1975).

VI

Crim alleges that he was denied a fair trial because of the Trial Court's failure to provide adequate funds for his investigator. Crim does concede that the Trial Court afforded him the maximum allowable under 18 U.S.C.A. § 3006A(e), but contends that he is entitled "to all funds necessary for his adequate defense". We cannot reverse a trial court for refusing to authorize the expenditure of investigative funds in excess of the limits prescribed by Congress. Beyond this basic rule, Crim has failed to establish the necessity of additional funds, and the authority under which the funds could be granted. We hold that the Court, most generously, allotted Crim investigative funds of $300.00.

Affirmed.